**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **GRANITE STATE INSURANCE COMPANY,**<br>**Plaintiff,**<br>**-against-**<br>**KM TACTICAL, LLC,**<br>**Defendant.** | **1:23-cv-07769 (ALC) (GS)**<br><br>**OPINION & ORDER** |

**ANDREW L. CARTER, JR., United States District Judge:**

In three underlying lawsuits, the City of Buffalo, the City of Rochester, and the State of New York sue KM Tactical, LLC ("KMT" or "Defendant") for selling firearm kits for "ghost guns," which are difficult to trace because they lack serial numbers or other traditional means of tracing firearms. Two of KMT's insurers, Plaintiff Granite State Insurance Company ("Granite State") and Intervenor Plaintiff Berkshire Hathaway Specialty Insurance Company ("BHSI") (collectively, the "Insurers"), disclaim any duty to defend or indemnify KMT in the underlying suits. The insurers seek a declaratory judgment. Since the insurance policies are limited to "occurrences," defined as accidents, the insurer's declaratory judgment request is GRANTED because none of the underlying lawsuits allege an accident.

## BACKGROUND[1]

### I. The Ghost Gun Lawsuits

[1] The following factual and procedural history is derived from the Complaint (ECF No. 1), the Intervenor Complaint (ECF No. 82), the Amended Counterclaims (ECF No. 95), Parties' Statement of Undisputed Material Facts (ECF Nos. 102, 111, 114, 115) and the documents referenced therein, including the New York Complaint (ECF No. 95-1) and Policy No. 02-LX-013240229-1 (ECF No. 95-8).

Defendant KM Tactical, LLC is a Missouri limited liability corporation with its registered office in Independence, Missouri. *See* ECF No. 95-1 ¶ 15 ("NY Complaint"). KMT is an "online retailer of gun parts and paraphernalia." NY Compl. ¶ 461. KMT is a defendant in at least one remaining lawsuit in New York for its alleged involvement in the sales of firearm kits containing unfinished receivers and frames that can be used to assemble "ghost guns"—called such because they lack serial numbers, registration, or other traditional means of tracing firearms. *Id*. ¶¶ 20-28. "Ghost guns" are "designed to subvert federal and state statutes that prevent guns from falling into the hands of people who cannot and should not possess them." *Id*. ¶ 19. The Ghost Gun Lawsuits were filed in 2022 by the New York Attorney General's Office, the City of Buffalo, and the City of Rochester against KMT and other firearms manufacturers and retailers in state court in New York County, Erie County, and Monroe County, respectively. Each action was subsequently removed to federal court, and the Buffalo and Rochester actions were consolidated in the District Court for the Western District of New York. *See People of the State of New York v. Arm or Ally, LLC et al.*, No. 22-cv-06124 (S.D.N.Y.) ("New York Lawsuit"); *City of Buffalo v. Smith & Wesson Brands, Inc. et al.*, No. 23-cv-00066 (W.D.N.Y.) ("Buffalo Lawsuit"); and *City of Rochester v. Smith & Wesson Brands, Inc. et al.*, No. 23-cv—06061 (W.D.N.Y.) ("Rochester Lawsuit") (collectively the "Ghost Gun Lawsuits"). KMT states they have been dismissed from the Rochester and Buffalo lawsuits and only remain a defendant in the New York Action. *See* ECF No. 110 at 3. As such, and because the Ghost Gun Lawsuits all contain substantially similar allegations and largely mirror each other, the Court takes as its primary framework the New York Complaint.

The New York Complaint alleges that KMT, along with the other defendants, have tried to subvert state and federal laws through the marketing and sales of "ghost guns." Federal law requires firearm manufacturers to include serial numbers on every firearm and to keep records of

which serial numbers correspond to which weapon in order to assist in tracing guns recovered at crime scenes. NY Compl. ¶ 74. Federal law also requires background checks when individuals purchase firearms, in an attempt to "keep guns out of the hands of dangerous persons." *Id*. ¶ 73. Nonetheless, the NY Complaint alleges "based on the fiction that Defendants' unfinished frames or receivers fall outside the federal definition of a 'firearm' under 18 U.S.C. § 921, Defendants have sold them directly to consumers without following any of the federal or state laws and regulations that apply to the sale of guns, and in particular without conducting a background check, placing a serial number on the gun, or entering it into a federal database so that it can be traced back to its source if used in a crime." NY Compl. ¶ 27.

Specifically as to KMT, the NY Complaint states that KMT "marketed and repeatedly sold unfinished frames and receivers to New Yorkers, and failed to exercise any controls on its sales." NY Compl. ¶ 461. KMT's website has approximately 120,000 visitors a month. *Id*. ¶ 463. KMT sent at least 8, 544 packages into New York States between December 22, 2017 and June 29, 2022, a "significant portion" of which contained unfinished frames and receivers. NY Compl. ¶¶ 469, 472. Like the other Defendants, KMT "invested in marketing designed to expand its market share of unfinished frames and receivers in New York and elsewhere, as well as to grow the industry as a whole." *Id*. ¶ 467. For example, KMT suggested "to its customers that their products are legal and benign" by "labeling the product 'ATF Approved.'" *Id*. ¶ 466. KMT allegedly purposefully "fail[s] to exercise any control on its sales" in order to attract individuals looking to get around gun control laws, leading to an increase in the number of "dangerous ghost guns present in the State." *Id*. ¶¶ 461, 468.

As a consequence of KMT's intentional marketing and sales scheme, the New York Complaint alleges that New York has faced a public health and safety crises caused by increased

gun violence and crime, in significant part due to the surge of untraceable ghost guns. *Id.* ¶¶ 54, 55. "The influx of ghost guns into New York" threatens public health and safety "by (i) increasing the number of firearms likely to be used in the commission of a crime, (ii) diminishing or unwinding the effect of on-point legal protections, including those relating to intimate partner violence, (iii) increasing the number of murders and suicides, and (iv) creating a new primary and secondary market for illicit guns in New York." *Id.* ¶ 574. As a result, "New York has had to (i) invest in ghost gun-specific law enforcement initiatives, technology, and resources, (ii) expend increasing amounts of resources on law enforcement investigative efforts to solve specific crimes involving assembled ghost guns, and (iii) research and implement other measures to quell the crisis, including expanding relevant community support and services and equipping more public hospitals with resources to treat gun-related injuries." *Id.* ¶ 575.

The New York Complaint includes claims under N.Y. Executive Law § 63(12) for repeated or persistent illegal and fraudulent conduct; under N.Y. General Business Law § 898-c for public nuisance; under N.Y. General Business Law § 349 for deceptive acts and practices; under N.Y. General Business Law § 350 for false advertising; for negligence per se; and for negligent entrustment. *Id.* ¶¶ 596-634.

## II. The Insurance Action

On March 27, 2023, Granite State received, through a third-party claims agent, KMT's claim for coverage for the Ghost Gun Lawsuits under four policies issued by Granite State covering the policy periods from September 6, 2018 through September 6, 2022. Granite State denied coverage on August 31, 2023. KMT also sought coverage under the Policy issued by BHSI, effective from September 6, 2022 through September 6, 2023. BHSI denied coverage on April 6, 2023.

The Parties appear to agree that Policy No. 02-L-013240229-1 (the "Exemplar Policy" or "Policy"), issued by Granite State to KMT effective September 6, 2021 to September 6, 2022, is "representative of the other Policies, which do not materially differ as to the policy terms relevant to this Motion". *See* ECF No. 101 at 4. Under the Exemplar Policy, the Insurers "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." *See* ECF No. 95-8, Exemplar Policy, at 128. The Policy further provides that the insurance applies in cases where "the 'bodily injury' or 'property damage' is caused by an 'occurrence'". *See id*. The Policy defines "bodily injury" as "bodily injury, sickness, or disease sustained by a person, including death resulting from any of these at any time." *Id*. at 140. The Policy defines "occurrence' as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id*. at 142.

On August 31, 2023, Granite State filed its complaint initiating this action. *See* ECF No. 1. On January 1, 2025, BHSI filed a motion to intervene in this action. *See* ECF No. 68. Magistrate Judge Gary Stein granted the BHSI's motion to intervene on May 27, 2025. *See* ECF No. 81. BHSI thereafter filed its Complaint in Intervention on May 30, 2025. *See* ECF No. 82. Count I of Granite State and BHSI's respective complaints both seek declarations that the Insurers do not owe KMT a duty to defend the Ghost Gun Lawsuits. *See* ECF No. 1 ¶¶39-42; *see also* ECF No. 82 ¶¶ 48-52. On August 19, 2025, KMT filed a First Amended Counterclaim. *See* ECF No. 95. Count 1 of KMT's Amended Counterclaims assert a cause of action for breach of contract based on the Insurers' denials that they have a duty to defend. *See* ECF No. 95 ¶¶ 19-23. Count II of KMT's Amended Counterclaims seek a declaration that the Insurers owe a duty to defend the Ghost Gun Lawsuits. *See id*. ¶¶ 24-26. On September 2, 2025, the Insurers each filed an Answer to the Amended Counterclaim. *See* ECF Nos. 96, 97. On November 14, 2025, the Insurers filed a motion

for partial summary judgment, along with the accompanying memorandum of law, Rule 56.1 Statement, and declarations. *See* ECF Nos. 100-104. On February 2, 2026, KMT filed its memorandum of law I opposition, along with its counter statement to Granite State's Rule 66.1 Statement. On March 4, 2026, the Insurers' filed their reply memorandum of law along with individual responses to KMT's counter statement to their Rule 56.1 Statement. *See* ECF Nos. 114, 115. The Insurers seek summary judgment on Count I of their respective complaints and Counts I and II of KMT's Amended Counterclaims to establish that the Insurers do not owe a duty to defend KMT against the allegations of misconduct in the Ghost Gun Lawsuits.

## LEGAL STANDARD

### I. Summary Judgment

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." *Cortes v. MTA New York City Transit*, 802 F.3d 226, 230 (2d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson*, 477 U.S. at 248. Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact. *See National Union Fire Ins. Co. of Pittsburgh, Pa. v. Walton Ins. Ltd.*, 696 F. Supp. 897, 900 (S.D.N.Y. 1988). An issue of fact is "genuine" when a reasonable fact finder could render a verdict in the nonmoving party's favor. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." (internal quotation omitted).

At summary judgment, the moving party has the burden "to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22

F.3d 1219, 1223 (2d Cir. 1994). To avoid summary judgment, a party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. When the moving party has met its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial." *Id.* When a motion for summary judgment is unopposed, a court "may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (quoting *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)) (internal quotation marks omitted).

In deciding a summary judgment motion, courts must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Niagara Mohawk Power Corp. v. Jones Chemical Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). Courts may not assess credibility, nor may they decide between conflicting versions of events because those matters are reserved for the jury. *See Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005). However, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Id.* (citing *Anderson*, 477 U.S. at 252).

**II. Choice of Law**

Missouri law applies to this case. Federal courts sitting in diversity jurisdiction apply the choice-of-law rules of the state in which they sit. *See Cassier v. Thyssen-Bornemisza Collection Found*., 596 U.S. 107, 115 (2022). "As the Policies contain no choice of law provision, New York law requires the Court to apply 'the center of gravity' approach, 'pursuant to which the court applies the law of the place which has the most significant contacts with the matter in dispute.'" Granite State Ins. Co. v. Primary Arms, LLC, No. 23 CIV. 7651 (LGS), 2024 WL 4008167, at *2 (S.D.N.Y. Aug. 30, 2024), aff'd, 161 F.4th 160 (2d Cir. 2025) (citing *RLI Ins. Co. v. AST Eng'g Corp.*, Nos. 20-214-CV. 20-596-CV, 2022 WL 107599, at *2 (2d Cir. Jan. 12, 2022) (summary order)). For insurance actions, "courts in New York generally apply the law of the jurisdiction which the parties understood was to be the principal location of the insured risk unless with respect to the particular issue, some other jurisdiction has a more significant relationship." *Id*. (quotations omitted). "Where the policy covers risks in two or more states, the state of the insured's domicile should be regarded as a proxy for the principal location of the insured risk." *Id*. (quotations omitted). Missouri law applies here because the Policies cover risk in multiple states, KMT is a Missouri limited liability corporation registered in Missouri, and the Parties agree that Missouri law applies. *See In re Snyder*, 939 F..3d 91, 200 n.2 (2d Cir. 2019) (recognizing implied consent is sufficient to establish the applicable choice of law); *see also* ECF No. 101 at 2 ("the parties agree [Missouri law] applies to this dispute").

## III. Interpretation of Insurance Policies and the Duty to Defend

Interpretation of an insurance policy is a question of law for the courts to decide. Am. Fam. Mut. Ins. Co., S.I. v. Lakewood Chiropractic P. C., No. 4:19-CV-00927-HFS, 2021 WL 7081081, at *4 (W.D. Mo. Sept. 30, 2021). "Missouri courts read insurance contracts as a whole and determine the intent of the parties, giving that intent by enforcing the contract as written." *Id*. As

such, "'issues involving the duty to defend are particularly amendable to summary judgment.'" *Id*. (citing *Reliance Ins. Co. v. Shenandoah South, Inc.*, 81 F.3d 789, 791 (8th Cir. 1996)). Courts should "interpret and enforce an insurance policy as written", and "words are to be given their plain and ordinary meaning." *Id*. (internal citations omitted). "Where insurance policies are unambiguous, they will be enforced as written absent a statute or public policy requiring coverage." *Id*. "If the language is ambiguous, it will be construed against the insurer." *Id*. (citing *Vogt v. State Harm Life Ins. Co.*, 963 F.3d 753, 763 (8th Cir. 2020) (applying Missouri law)). The court applies the meaning of the insurance policy terms "as it would be understood by an ordinary person of average understanding purchasing insurance." *Id*. (citing *Ritchie v. Allied Property & Cas. Ins. Co.*, 307 S.W.3d 132, 135 (Mo. Banc 2009)).

Under Missouri law, "[t]he duty to defend 'arises whenever there is a potential or possible liability to pay based on the facts at the outset of the case.'" *Id*. at *5 (citing *American Family Mut. Ins. Co., S.I. v. Mid-America Grain Distributors, LLC*, 958 F.3d 748, 752 (8th Cir. 2020) (applying Missouri law)). "[W]hether the duty to defend exists is generally 'determined by comparing the language of the insurance policy with the allegations in the [underlying] complaint.'" *Id*. "If the complaint merely alleges facts that give rise to a claim potentially within the policy's coverage, the insurer has a duty to defend." *Id*. (internal quotations and citation omitted). Where there is no duty to defend, "there can be no duty to indemnify as a matter of law." *Id*. (citing *Superior Equip. Co. v. Maryland Cas. Co.*, 986 S.W.2d 477, 484(Mo. App. 1998)). The burden of proving the duty to defend falls on the insured under Missouri law. *American Family Mut. Ins. Co., S.I.*, 958 F.3d at 752.

**DISCUSSION**

The Policy provides that it applies in cases where "bodily injury" or "property damage" is caused by an "occurrence." *See* Exemplar Policy at 128. The Policy further defines an "occurrence" as an "accident." *See id*. at 142. The Insurers argue they have no duty to defend the Ghost Gun Lawsuits because (1) the allegations do not allege harm caused by an "occurrence' and (2) the allegations do not allege damages "because of" bodily injury. *See generally* ECF No. 101. As discussed further below, the Court finds the Polices do not cover the Ghost Gun Lawsuit because the complaint does not allege an "accident" under the policies, analyzed under Missouri law.

**I. The Ghost Gun Lawsuits Do Not Allege Harm Caused by an "Accident"**

In *Granite State Insurance Co. v. Primary Arms, LLC*, Second Circuit recently analyzed whether Insurer Granite State owed a duty to defend another defendant in connection with allegations in the same New York Complaint applicable here. 161 F.4th 160 (2d Cir. 2025). The Second Circuit found held that the New York Action did not allege the requisite "accident," covered as an "occurrence" under identical insurance policies as here, and thus Granite State had no duty to defend the insured in the New York Action. *See id*. at 170-171. However, *Primary Arms* involved the application of Texas law as to the definition of an "accident," while Missouri law is applicable in the case before the Court now. Thus, the Court will compare the definition of an "accident" under Texas and Missouri law in order to determine how the Second Circuit's holding in *Primary Arms* applies to this case.

Under Missouri law, "an 'accident' is defined as 'that which happens by chance or fortuitously, without intention or design, and which is unexpected, unusual, and unforeseen.'" *Am. Fam. Mut. Ins. Co., S.I. v. Lakewood Chiropractic P. C.*, No. 4:19-CV-00927-HFS, 2021 WL 7081081, at *5 (W.D. Mo. Sept. 30, 2021) (citing *Taylor-Morley-Simmon, Inc. v. Michigan Mutual Insurance Co.*,

645 F.Supp. 596, 599 (E.D. Mo. 1986)). In the context of insurance contracts, Missouri courts have defined "accident" as "an 'event that takes place without one's foresight or expectation; an undesigned sudden and unexpected event. Hence, often an undesigned and unforeseen occurrence of an afflictive or unfortunate character; a mishap resulting in injury to a person or damage to a thing; a casualty; as to die by accident.'" *Id*. (citing *Hampton v. Cater Enterprises, Inc.*, 238 S.W.3d 170, 175 (Mo. App. 2007)). An intentional act may be considered an "accident." *Am. Fam. Mut. Ins. Co., S.I. v. Mis-Am. Grain Distributors, LLC*, 958 F.3d 748, 752 (8th Cir. 2020) (citing *Fid. & Cas. Co. of N.Y. v. Wrather*, 652 S.W.2d 245, 249 (Mo. Ct. App. 1983). However, the "determinative inquiry" into whether an "act is an accident is whether the insured foresaw or expected the injury or damages." *See id*. at 752-53 (internal quotations and citations omitted). To be clear, "an 'accident' does not include acts that result in 'expected or foreseeable damage.'" *See id.* (internal citation omitted). In making this determination, "the Court applies 'an objective standard—whether a reasonably prudent person would foresee this accident—and instead of an analysis of . . . subjective intent of expectation.'" *Am. Fam. Mut. Ins. Co., S.I. v. Lakewood Chiropractic P.C.*, 2021 WL 7082082, at *5.

Missouri's definition of an "accident" is substantially similar to Texas's definition as outlined in *Primary Arms*. The Second Circuit found that under Texas law that an act "is not an accident when [1] [an individual] commits an intentional act that [2] results in injuries that ordinarily follow from or could be reasonably anticipated from the intentional act." *Granite State Ins. Co. v. Primary Arms, LLC*, 161 F.4th at 169. As Texas and Missouri law are substantially in accord on the definition of an "accident" in the context of an insurance policy, the Court's reasoning in *Primary Arms* applies in this case as well. While *Primary Arms* addressed the conduct of a firearms retailer other than KMT, those distinctions are without a difference. Many of the

allegations in the New York Complaint apply to all defendants in the action, and the specific allegations as to the firearms retailer in *Primary Arms* relied upon are substantially similar to the ones alleged against KMT.

First, just as in *Primary Arms*, the Ghost Gun Lawsuits allege KMT committed intentional acts. Specifically, the *Primary Arms* Court acknowledged that the firearms retailer in that suit "intended to sell and knowingly sold unfinished frames and/or receivers to individuals who were likely to create an unreasonable risk of harm to others, such as those with criminal convictions, subject to restraining orders, with disqualifying mental health histories, or who lacked proper licensing and training." 161 F.4th at 170 (internal quotations and citations omitted). Further, "Primary Arms intended not only to sell its products but to sell them specifically to people who could not buy a firearm through legitimate channels . . . and who cannot and should not have a deadly weapon . . . but who nevertheless were motivated to possess a gun." *Id*. Here, the ghost Gun Lawsuits similarly allege KMT committed intentional acts. The NY Complaint states that KMT "marketed and repeatedly sold unfinished frames and receivers to New Yorkers, and failed to exercise any controls on its sales." NY Compl. ¶ 461. KMT "invested in marketing designed to expand its market share of unfinished frames and receivers in New York and elsewhere, as well as to grow the industry as a whole." *Id*. ¶ 467. As such, KMT intentionally "failed to exercise any control on its sales" in order to attract individuals looking to get around gun control laws, leading to an increase in the number of "dangerous ghost guns present in the State." *Id*. ¶¶ 461, 468.

Second, the resulting financial harm to New York State was the foreseeable and expected result of KMT's intentional acts for the same reasons discussed in *Primary Arms*. The allegations relied upon for this part of the analysis are not unique to the firearms retailer in *Primary Arms*, but rather applied to all defendants in the New York Action. The intentional acts by the firearms

retailers "spawned an 'influx of ghost guns into New York … [that] (i) increas[ed] the number of firearms likely to be used in the commission of a crime, (ii) diminish[ed] or unw[ound] the effect of on-point egal protections, including those relating to intimate partner violence, (iii) increase[ed] the number of murders and suicides, and (iv) create[ed] a new primary and secondary market for illicit guns in New York.'" These consequences could have been reasonably anticipated given the allegation that KMT "sold unfinished frames or receivers into New York State knowing, intention, or being willfully blind to the fact that these products would be converted into working, unserialized firearms, while marketing their products as a way around serialization requirements, and portraying serialization as optional, unnecessary, or undesirable." NY Compl. ¶ 599. Thus, the ensuing financial burden on New York State was an expected and foreseeable result of KMT's marketing and sales strategy. As the *Primary Arms* Court acknowledged, "[o]ne would naturally expect that a state or local government responding to increased gun-related incidents would need to spend more—on deploying policy officers to the scenes of gun violence, on law enforcement investigations seeking to solve ghost-gun-related crimes, on expending community support services for those affected by gun violence, and on hospital resources required to treat gun-related injuries." 161 F.4th at 170. Thus, the financial injuries to New York State were foreseeable. There is no accident alleged where the insured's "acts result in expected or foreseeable damage[s]." *American Family Mut. Ins. Co., S.I. v. Mid-America Grain Distributors, LLC*, 958 F.3d at 753. (internal citation and quotations omitted). Thus, the Court finds that the Ghost Gun Lawsuits do not allege an occurrence as defined by the Policy.

## II. KMT's Arguments Fail

KMT argues that its actions should be categorized as merely negligent rather than intentional or that there is "negligent misrepresentation" exception to the accident requirement

under Missouri law. *See generally* ECF No. 110. To the extent KMT argues there is an exception to the accident requirement for misrepresentation-based marketing claims, this argument is unavailing. KMT cites to *Wood v. Safeco Ins. Co. of Am.*, 980 S.W.2d 43 (Mo. Ct. App. 1998), to argue "misrepresentation claims constitute an 'occurrence' absent intent to deceive." *Wood* does not apply here as that case involved. In the case currently before the Court, the Insurers correctly argue that it is not relevant "to the 'accident analysis whether KMT's alleged misrepresentations were negligent or intentional, because the alleged harm—New York's increased budgetary costs to abate the public nuisance caused by 'ghost guns'—is not alleged to be the result of reliance by ghost gun purchasers on KMT's misrepresentations about the legality of its products." ECF No. 113 at 5. The New York Complaint alleges KMT caused a public nuisance by intentionally marketing and selling unfinished frames and receivers to individuals who sought to evade gun control laws and whom KMT knew were likely to create an unreasonable risk of harm. *See*, *e.g.,* NY Compl. ¶¶ 461, 468. Further, *Wood* was distinguished by the court in *Am. Fam. Mut. Ins. Co., S.I. v. Lakewood Chiropractic P. C.*, with respect to determining whether certain allegations qualified as an "accident' or "occurrence' under Missouri law. *See Am. Fam. Mut. Ins. Co., S.I. v. Lakewood Chiropractic P. C.,* No. 4:19-CV-00927-HFS, 2021 WL 7081081, at *8 (W.D. Mo. Sept. 30, 2021) ("[T]here are no allegations that Lakewood's conduct or representations as to its billing practices were the result of negligence. Thus, Lakewood has failed to provide any disputed genuine fact that the claims . . . qualify as an 'occurrence' or 'accident' to trigger coverage under the Policies.") Similarly here, the allegations in the New York Complaint convey intentional conduct on the part of KMT, not conduct that was the result of negligence. As discussed above, the New York Complaint alleges intentional acts and misrepresentations to customers in order to target consumers who cannot legally purchase firearms. As acknowledged in *Primary Arms*, the Ghost

Gun Lawsuits "contain no factual allegations of negligence and therefore do not allege an accident." *Granite State Ins. Co. v. Primary Arms, LLC*, 161 F.4th at 171. "The same analysis applies to the State complaint's inclusion of the negligence per se and negligent entrustment counts." *Id*. KMT's argument that Missouri law directs the courts to consider facts known and reasonably ascertainable by the Insurers at the time of denial of coverage does not alter the Court's analysis. Specifically, KMT argues the Insurers were aware KMT was in the business of selling firearm parts and accessories and knew KMT sold unfinished frames and receivers. *See* ECF No. 110 at 5. KMT also points out that the Insurers knew or reasonably should have known that KMT relied on letters from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") stating that unfinished frames and receivers such as those sold by KMT fell outside the mandates of the Gun Control Act of 1968 ("GCA"). *See id*. at 5-6. Thus, KMT argues that the "readily ascertainable facts at the time of denial confirm, at most, negligence reliance on ATF guidance" by KMT and the results of such conduct should be considered an "accident," triggering the duty to defend. *See* ECF No. 110 at 7-8. This argument is unavailing. KMT's reliance on ATF guidance in its marketing and sales strategy does not negate the allegations that KMT's conduct was intentional nor does it have any bearing on whether the injuries alleged in the New York Complaint were foreseeable.

Further, KMT argues that the "accident" requirement cannot be used to deny coverage for claims that arise from KMT's coverage under the PCO-Hazard coverage. Just as in *Primary Arms*, this Court rejects that argument as there are not sufficient bases in Missouri law. The Missouri Court of Appeals has reasoned that "the unambiguous language of the Policy does not provide that the PCOH coverage applies to non-occurrences or is a separate grant of coverage outside of Coverage A because the PCOH coverage is for bodily injury, and coverage for bodily injury is only provided in Coverage A." *Ash v. Gen. Cas. Co. of Wisconsin*, 685 S.W.3d 565, 570 (Mo. Ct. App.

2024). Similarly, PCO-Hazard claims are covered under the Policy only if they satisfy the terms of Coverage A, including the "accident" requirement. *See* Exemplar Policy at 138 ("[PCO-Hazard] Aggregate Limit is the most we will pay under Coverage A for damages because of 'bodily injury' and 'property damage' included in the [PCO-Hazard].").

**III. "Because of" Bodily Injury or Property Damage**

The Insurers further argue that they are not obligated to defend KMT in the Ghost Gun Lawsuits because the actions do not seek damages "because of" bodily injuries, as required under the Policy. *See* ECF No. 101 at 21-25. KMT disagrees and argues the Ghost Gun Lawsuits do allege damages "because of" bodily injury or property damage within the meaning of the Policy. *See* ECF No. 110 at 15-18. As previously discussed, the Policy provides that it applies in cases where "bodily injury" or "property damage" is caused by an "occurrence." *See* Exemplar Policy at 128. Because the Court finds that the Ghost Gun Lawsuits do not allege harm caused by an "occurrence" within the meaning of the Policy, the Court need not reach the issue of whether the action alleges damages "because of" bodily injury to resolve the motions. *See Granite State Ins. Co. v. Rainier Arms LLC,* 773 F. Supp. 3d 24, 45 (S.D.N.Y. 2025) ("Because this Court finds that the Ghost Gun Lawsuits do not allege harm caused by an 'occurrence,' the Court need not reach this issue to resolve the motions.").

**CONCLUSION**

For the foregoing reasons, the Insurers' motion for summary judgment is hereby **GRANTED.** The insurance policies at issue do not obligate the Granite State Insurance Company or Berkshire Hathaway Specialty Insurance Company to defend or indemnify KM Tactical, LLC in the Ghost Gun Lawsuits. The Clerk of the Court is respectfully directed to terminate the pending

motion at ECF No. 100. The parties are ordered to file a joint status report by **September 22, 2026**. This joint status report should address the status of the case and next steps regarding the remaining breach of contract counterclaim by KMT.

**SO ORDERED.**

**Dated: September 1, 2026**

**New York, New York**

Andrew L Carter Jr

**ANDREW L. CARTER, JR.**

**United States District Judge**